1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

EASTERN DISTRICT OF CALIFORNIA

8
9

10

LAMONT SHEPARD,

Case No. 1:10-cv-00023-DLB PC

11

Plaintiff,

v.

**ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
(ECF No. 37)**

12

JAMES E. TILTON, et al.,

13

Defendants.

14
15

16 **I.     Background**

17        Plaintiff Lamont Shepard ("Plaintiff") is a prisoner in the custody of the California

18 Department of Corrections and Rehabilitation ("CDCR").  Plaintiff is proceeding pro se and in

19 forma pauperis in this civil action pursuant to 42 U.S.C. § 1983.  This action is proceeding on

20 Plaintiff's complaint, filed January 6, 2010, against L. A. Martinez, R. Perez, P. Garcia, J. Soto, E.

21 De la Cruz, and A. Trevino for excessive force in violation of the Eighth Amendment.  On February

22 9, 2012, Plaintiff filed a motion for summary judgment.  ECF No. 37.  On April 9, 2012, Defendants

23 filed their opposition.  ECF No. 45.  On April 24, 2012, Plaintiff filed his reply.  ECF Nos. 48, 52.

24 The matter is submitted pursuant to Local Rule 230(l).

25 **II.     Summary Judgment Standard**

26        Summary judgment is appropriate when it is demonstrated that there exists no genuine

27 dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law.

28 Fed. R. Civ. P. 56(a).  Under summary judgment practice, the moving party

1

1

2

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

3

4

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the

5

burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in

6

reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"

7

*Id.* at 324.  Indeed, summary judgment should be entered, after adequate time for discovery and upon

8

motion, against a party who fails to make a showing sufficient to establish the existence of an

9

element essential to that party's case, and on which that party will bear the burden of proof at trial.

10

*Id.* at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's

11

case necessarily renders all other facts immaterial." *Id.*  In such a circumstance, summary judgment

12

should be granted, "so long as whatever is before the district court demonstrates that the standard for

13

entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

14

If the moving party meets its initial responsibility, the burden then shifts to the opposing

15

party to establish that a genuine dispute as to any material fact actually does exist.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

16

In attempting to establish the existence of this factual dispute, the opposing party may not

17

rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form

18

of affidavits, and/or admissible discovery material, in support of its contention that the dispute

19

exists.  Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party must

20

demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit

21

under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Thrifty Oil Co.*

22

*v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2002); *T.W. Elec. Serv., Inc.*

23

*v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

24

genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

25

party, *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *Wool v. Tandem*

26

*Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

27

In the endeavor to establish the existence of a factual dispute, the opposing party need not

28

establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

1    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

2    trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the

3    pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

4    *Matsushita*, 475 U.S. at 587 (quoting former Rule 56(e) advisory committee's note on 1963

5    amendments).

6           In resolving a motion for summary judgment, the court examines the pleadings, depositions,

7    answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ.

8    P. 56(c).  The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all

9    reasonable inferences that may be drawn from the facts placed before the court must be drawn in

10   favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold, Inc.*, 369

11   U.S. 654, 655 (1962) (per curiam)).

12          Finally, to demonstrate a genuine dispute, the opposing party "must do more than simply

13   show that there is some metaphysical doubt as to the material facts. . . .Where the record taken as a

14   whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

15   issue for trial.'"  *Matsushita*, 475 U.S. at 586-87 (citations omitted).

16   **III.    Plaintiff's Motion**

17          **A.     Failure to Comply with Local Rules**

18          Plaintiff lists undisputed facts in his motion for summary judgment without citation.  Pl.'s

19   Mem. P. & A. 2-6.  Pursuant to Local Rule 260(a),

20          Each motion for summary judgment or summary adjudication shall be accompanied
            by a "Statement of Undisputed Facts" that shall enumerate discretely each of the
21          specific material facts relied upon in support of the motion and cite the particular
            portions of any pleading, affidavit, deposition, interrogatory answer, admission, or
22          other document relied upon to establish that fact. The moving party shall be
            responsible for the filing of all evidentiary documents cited in the moving papers.
23

24          An examination of Plaintiff's statement of facts indicates that Plaintiff does not provide the

25   particular citation to the document relied upon to establish the facts.  "A party asserting that a fact

26   cannot be genuinely disputed must support the assertion by . . . citing to particular parts of materials

27   in the record."  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed,

28   *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed

1    before the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587.  For the

2    sake of clarity, the Court will list Plaintiff's statement of facts and Defendants' disputes.

3    **B.    Plaintiff's Unsupported Statement of Facts and Defendants' Disputes**

4        1.    Plaintiff, a prisoner of the State of California, is serving a life sentence for first degree

5    murder.  Defendants do not dispute this fact.

6        2.    On March 15, 2009, Plaintiff informed Director Tilton via Declaration that one of

7    your officers told me (Plaintiff) that the officers here at C.S.P. – Corcoran has it out for me,

8    (Plaintiff) a "red light," and that Plaintiff life was at stake.

9        Defendants dispute this fact because there is no citation to any evidence, and the fact contains

10   inadmissible hearsay and is irrelevant to the events.[1]

11       3.    On July 28, 2009, Plaintiff was threaten by Defendant Martinez, and informed

12   Plaintiff that, "we go get you N.Word."  Plaintiff immediately filed an Inmate Appeal to inform the

13   Warden of Defendant Martinez's intentions to no avail.

14       Defendants contend that Defendant Martinez never threatened Plaintiff.  Martinez Decl. ¶

15   44.[2]

16       4.    On August 4, 2009, Defendant Martinez worked overtime on third watch alone with

17   Defendants De la Cruz and Soto to carry out their threat.

18       Defendants do not dispute that Defendants Martinez, De La Cruz, and Soto worked overtime

19   on August 4, 2009.  However, Defendants dispute all other facts, contending that Defendants

20   Martinez, De La Cruz, and Soto did not threaten, assault, or beat Plaintiff on August 4, 2009.

21   Martinez Decl. ¶¶ 3-7, 28-42; De La Cruz Decl. ¶¶ 9-18, 21-24; Soto Decl. ¶¶ 8-21.

22       5.    Specifically, on August 4, 2009, Plaintiff was walking the exercise yard of facility 3A

23   at C.S.P. (Corcoran) at approximately 1530 hours, and noticed an inmate Josey on the east yard. It's

24   the same yard but has a fence down the middle making two yards east yard and west yard. Plaintiff

25   was on the west yard and stopped to talk to inmate Josey, as Plaintiff and Josey are conversing

26   Defendant Perez, rudely stepped in front of I/M Josey, in stated: "you guys cannot talk through the

27

28       ---
         [1] Defendants are correct.  Plaintiff's fact is inadmissible hearsay and irrelevant to the events on August 4, 2009.
         [2] All declarations are from Defendants' declarations in opposition to Plaintiff's motion for summary judgment.
         ECF No. 47.

4

1  fence." Josey and Plaintiff side stepped Defendant Perez and continued to converse with one

2  another, again Defendant Perez stepped in front of I/M Josey. So Plaintiff told Josey, "I will

3  hollar/talk to you when this racist as pig stop tripping."

4        Defendants do not dispute that a fence divides the yard on Facility 3A into an east and west

5  yard and that Defendant Perez told the inmates, including Plaintiff, to stop talking.  Defendants

6  dispute all other facts.  Defendant Perez gave Plaintiff a direct order to stop talking and keep moving

7  because he was stopped on the track to have his conversation, which is prohibited by yard

8  regulations. Further, Plaintiff responded to Perez's order with profanity. Perez Decl. ¶¶ 2-6.

9        6.     Plaintiff proceeded to walk away. So did I/M Josey, however, Plaintiff was called

10  back by Defendant Perez, as Plaintiff turned around Plaintiff notice Defendant Trevino and Garcia

11  was on the west side yard and Defendant Perez coming through the center gate. Defendant Trevino

12  stated: "He's acting hard in front of his homies. We'll get him later when he's by himself."

13        Defendants do not dispute that Defendant Perez called to Plaintiff.  Defendants dispute as to

14  all other facts.  Defendant Perez walked over to the west yard where Plaintiff was located, asked

15  Plaintiff for his identification card, and Plaintiff walked within an arm's length of Defendant Perez.

16  Defendants Perez and Trevino ordered Plaintiff to step back away from Plaintiff, but he failed to

17  comply with those orders.  Instead, he used more profanity and took a bladed stance and clenched

18  his fists.  Perez Decl. ¶¶ 7-11; Trevino Decl. ¶¶ 8-13; Garcia Decl. ¶¶ 3-8.

19        7.     Plaintiff walked back to Defendant Perez and asked him what the problem was. He

20  stated: "Back up." Plaintiff took a step back. Perez then asked for Plaintiff's [Identification Card].

21  Plaintiff went to hand Perez his I/D. card. But let it drop to the grass. Defendant Perez stated: "Pick

22  that up." Plaintiff stated: "no, cause if I pick it up, I'm going to put it back in my pocket," Defendant

23  Perez stated: "Well, back up, so I could get it." Plaintiff took another full step back.  Defendant

24  Perez picked up the I.D. card and stated: "Do you know you guys can't talk through the yard fence at

25  yard time."

26        Defendants do not dispute that Defendant Perez ordered Plaintiff to produce his identification

27  card and that Plaintiff walked up to Defendant Perez.  Defendants dispute all other facts.  Defendants

28  contend that Defendant Perez walked over to the west yard where Plaintiff was located, asked

1  Plaintiff for his identification card, and Plaintiff walked within an arm's length of Defendant Perez.

2  Defendants Perez and Trevino ordered Plaintiff to step back away from Plaintiff, but he failed to

3  comply with those orders. Instead, he used more profanity and took a bladed stance and clenched his

4  fists.  Perez Decl. ¶¶ 7-11; Trevino Decl. ¶¶ 8-13; Garcia Decl. ¶¶ 3-8.

5      8.      Plaintiff responded with: "is this rule for black inmates only?"

6  Defendants dispute this fact, contending that Plaintiff addressed Perez and Trevino with

7  profanity and threatening gestures. Perez Decl. ¶¶ 7- 11; Trevino Decl. ¶¶ 8-13; Garcia Decl. ¶¶ 3-8.

8      9.      Defendants Trevino and Garcia took up positions on either side of Defendant Perez.

9  With Defendant Trevino more to Plaintiff's left and Defendant Garcia was to Plaintiff's right with

10  Defendant Perez directly in front of Plaintiff.

11  Defendants dispute this fact.  Defendants contend that Plaintiff walked up to Defendants

12  Perez, Trevino, and Garcia, and used profanities and made threatening gestures.  Perez Decl. ¶¶ 7-

13  11; Trevino Decl. ¶¶ 8-13; Garcia Decl. ¶¶ 3-8.

14      10.      Defendant Trevino then stated: Fuck N. Words. Now do something…Please." Then

15  Defendant Trevino O.C. Pepper Sprayed Plaintiff on the left side of the face. Plaintiff is above irate

16  at this point and turned toward the spray in order to even the score with Defendant Trevino, however

17  the spray hit Plaintiff dead on in the face and Plaintiff dropped to the ground to get under the O.C.

18  Spray and to wipe my eyes to see. Plaintiff notice defendant Trevino standing in front of him and

19  went to go after Defendant Trevino and he (Trevino) ran and someone pushed Plaintiff in the back

20  causing Plaintiff to be off balance and fell on the grass, landing on his back.

21  Defendants do not dispute that Defendant Trevino pepper-sprayed Plaintiff in the facial area.

22  Defendants dispute all other facts. Defendants contend that Defendant Trevino pepper-sprayed

23  Plaintiff after Plaintiff lunged towards Defendants Trevino and Perez. Plaintiff swung his fists and

24  struck Perez on the left side of the head. Trevino and Perez took Plaintiff down to the ground, where

25  he continued to swing his arms, kicked his legs, and resisted their efforts to restrain him.  Perez Decl.

26  ¶¶ 12-16; Trevino Decl. ¶¶ 14-20; Garcia Decl. ¶¶ 8-17.

27      11.      Plaintiff felt someone straddle him, but due to the O.C. spray Plaintiff started to feel

28  the effect on Plaintiff's eyes. Plaintiff was then turned over on to my stomach and handcuffs were

1   applied.

2       Defendants do not dispute that Plaintiff was eventually turned over onto this stomach and

3   handcuffed.  Defendants dispute all other facts, contending that no one straddled Plaintiff. Martinez

4   responded to the incident and placed his right knee on Plaintiff's right shoulder to restrain him. Perez

5   Decl. ¶¶ 12-16; Trevino Decl. ¶¶ 14-20; Garcia Decl. ¶¶ 8-17; Martinez Decl. ¶¶ 3-7.

6       12.     Plaintiff then heard someone said, "Who is this Shepard." Plaintiff then felt someone

7   jump, knee first into Plaintiff's back. Knocking the wind out of Plaintiff at that same motion

8   someone else jumped on Plaintiff's back and Plaintiff asked them (officers) could they please get off

9   my back cause I could not "breathe," only to be told "Shut the Fuck up, 'cause we about to beat your

10  ass right now." Plaintiff smelled a faint of alcohol coming from the person's (officers) breath that

11  made that statement. Plaintiff smelt the same alcoholic breath coming from defendant Trevino when

12  he stated: "Fuck N. Words no do something…please!"

13      Defendants dispute Plaintiff's fact, contending that no one jumped on Plaintiff's back.

14  Defendant Martinez responded to the incident and placed his right knee on Plaintiff's right shoulder

15  to restrain him.  Perez Decl. ¶¶ 12-16; Trevino Decl. ¶¶ 14-20; Garcia Decl. ¶¶ 8- 17; Martinez Decl.

16  ¶¶ 3-7.

17      13.     The officers got off of Plaintiff's back due to Plaintiff moving around and kicking due

18  to unable to breathe and reposition themselves on Plaintiff's shoulder blades.

19      Defendants do not dispute that Defendant Martinez placed his right knee on Plaintiff's right-

20  shoulder area and that Plaintiff was kicking.

21      Defendants dispute all other facts, contending that Defendant Martinez placed his right knee

22  on Plaintiff's shoulder to restrain him.  Perez Decl. ¶¶ 12-16; Trevino Decl. ¶¶ 14-20; Garcia Decl.

23  ¶¶ 8-17; Martinez Decl. ¶¶ 3-7.

24      14.     Plaintiff was in this position for about 3 minutes max.

25      Defendants dispute this, contending that the entire struggle lasted no more than two minutes.

26  There is no evidence how long Plaintiff remained on the ground while staff cleared a safe path off

27  the yard.  Perez Decl. ¶ 16; Trevino Decl. ¶ 20; Garcia Decl. ¶ 17; Martinez Decl. ¶ 7.

28      15.     Plaintiff was then lifted off the ground and Plaintiff was escorted off the yard during

1    the escort Plaintiff overheard someone (officer) instruct the escorter of Plaintiff to immediately take

2    him to 3A05 for decontamination. Plaintiff stated overheard 'cause [sic] of the O.C. spray in

3    Plaintiff's eyes."

4         Defendants do not dispute that Plaintiff was assisted to his feet and escorted off the yard, and

5    that sometime before reaching the Program Office, Defendant Martinez was instructed to take

6    Plaintiff to a location where he could be decontaminated.  Defendants dispute all other facts.

7    Captain Seifert, who was on the pathway to the Program Office, stated that Plaintiff needed to be

8    contaminated, but did not specify where. Defendant Martinez noticed that the path to the gymnasium

9    was clear of inmates, but learned that the showers in the gym were not working. Lieutenant Gamboa,

10   who was standing near Seifert, instructed Defendant Martinez to take Shepard to Building 3A05. But

11   the pathway to the housing unit was not clear of inmates. Defendant Martinez informed Gamboa that

12   he needed to place Plaintiff in the Program Office while the path was cleared, and Defendant

13   Martinez received no objection or further instruction from Seifert or Gamboa.  Martinez Decl. ¶¶ 20-

14   25.

15        16.    However, due to the breeze (light) of that day, it helped Plaintiff open his eye and

16   notice defendants Soto and Martinez was escorting him.  Plaintiff was escorted directly to the

17   "Program Office," and place against the left side wall upon entry for about a minute but as he is

18   standing he is calling out to the lieutenant that defendants just threatened to jump him to no avail.

19        Defendants do not dispute that Defendants Martinez and Soto escorted Plaintiff to the

20   program office.  Defendants dispute all other facts, contending that Plaintiff did not call out to

21   Gamboa or Seifert. He was calling out to other inmates in an attempt to incite them.  Martinez Decl.

22   ¶¶ 23-24.

23        17. Plaintiff was escorted into the cage area of the program office which is directly to your

24   right entry and placed in the cage to the left of the room. Here, defendant Martinez started socking

25   Plaintiff in the back of head [sic] stating: "Ole you go get it now, you fucking Mayete." Due note:

26   while Plaintiff was standing on the wall of the program office Plaintiff heard defendant Martinez

27   state: "Stand here and don't let no one [sic] in. We about to beat this Mayete ass," and close the door

28   of the program office.

1      Defendants do not dispute that Plaintiff was escorted to the holding-cell area in the Program

2  Office and that the holding-cell area is immediately to the right upon entering the Program Office.

3  Defendants dispute all other facts, contending that Defendant Martinez did not sock, punch, or hit

4  Plaintiff or use racial slurs against him. When Defendant Soto attempted to place Plaintiff in the

5  holding cell, Plaintiff kicked off the back of the holding cell, forcing his upper body to impact

6  Defendant Soto's upper-chest area, and causing both Plaintiff and Defendant Soto to fall to the

7  ground.  Martinez Decl. ¶¶ 28-32; Soto Decl. ¶¶ 8-12; De La Cruz Decl. ¶¶ 9-14.

8      18.    Defendants Soto, Perez, Delacruz and Trevino followed suit of defendant Martinez.

9  Plaintiff told defendants to take the handcuff off and we could do this like real man instead of

10  cowardly jumping me with my hands behind my back in leg iron on.

11      Defendants dispute the fact, contending that none of the Defendants hit, punched, or kicked

12  Plaintiff.  Defendants Perez and Trevino were not even in the holding-cell area of the Program

13  Office; they were in the medical clinic.  Perez Decl. ¶¶ 22-26; Trevino Decl. ¶¶ 23-27; Garcia Decl.

14  ¶¶ 22-25; Martinez Decl. ¶¶ 38-42; De La Cruz Decl. ¶¶ 21-24; Soto Decl. ¶¶ 17-21; Scaife

15  Crime/Incident Report, attached to Esquivel Decl. Ex. B, pp. 60-61.

16      19.    One of defendants then grabbed a hold of Plaintiff's hair and banged Plaintiff's face

17  against the back of the cage busting Plaintiff's lower lip.

18      Defendants dispute the fact, for the reasons provided as to Number 18.

19      20.    Defendants then grabbed Plaintiff shirt and pulled Plaintiff to the ground. Defendant

20  Martinez jumped on top of Plaintiff and started socking Plaintiff about the face about 4 – 6 times

21  either someone pulled him off Plaintiff or he got up on his own, however, defendants Martinez,

22  Perez, Soto, Trevino and Delacruz started kicking and stomping Plaintiff about the face.

23       Defendants dispute the fact, for the reasons provided as to Number 18.

24      21.    Plaintiff tried unsuccessfully to roll over to avoid the kicking only to have the

25  handcuffs stomped on rolling back over. Plaintiff notice a small type object hit the floor seeing they

26  were some shades or glasses, looking up only to find defendant Delacruz running at me and kick

27  Plaintiff in the right eye. Plaintiff was knocked unconscious.

28      Defendants dispute the fact, for the reasons provided as to Number 18.

1    22.    Plaintiff was awoken by more kick and stomps and words of the racist language.

2   Again, Plaintiff tried to roll over and again the handcuffs was stomped on and again Plaintiff rolled

3   over on his back as oppose to being on his side due to being kicked in the right eye only this time

4   Plaintiff looked up to find defendant Perez standing there looking down and stated: "Fucking N.

5   Word" drew back his foot and kicked Plaintiff in the left eye busting it wide open knocking Plaintiff

6   out a second time.

7        Defendants dispute the fact, for the reasons provided as to Number 18.

8        23.    Plaintiff is unsure of how long he was unconscious but was awakened by someone

9   yelling at his officers. Unsure of what was being said due to Plaintiff's consciousness after sometime

10  someone pulled Plaintiff to his feet and place Plaintiff against the wall. Previously when Plaintiff

11  first entryed [sic] Plaintiff is going off calling defendant BITCHES, Coward are any name at present

12  time Plaintiff could think of at this point the gloves are off. Plaintiff is very upset from being jumped

13  in said matter. The captain walked over and stated: "Calm down. I need for you to calm down for

14  me. I seen what happen [sic]. Well the ending of it. So I'm go [sic] have my officers here escort you

15  to 3A05 for decontamination. So let my officers escort you and I'll be in the CID clinic when you

16  get there."

17       Defendants do not dispute that Defendants Martinez and Soto stood Plaintiff up inside the

18  holding-cell area and that Plaintiff leaned up against the wall in the hallway, or that Plaintiff was

19  escorted out of the Program Office to building 3A05 by two officers.

20       Defendants dispute all other facts, contending that after Defendants Martinez and Soto

21  regained control of Plaintiff inside the holding-cell area, they stood him up and led him to the

22  hallway of the Program Office. Gamboa entered the room and ordered two officers to escort Plaintiff

23  to the housing unit. Gamboa never made any of the comments Plaintiff attributes to him.  Martinez

24  Decl. ¶¶ 33-37; Soto Decl. ¶¶ 13-16; Gamboa Crime/Incident Report, attached to Esquivel Decl. Ex.

25  B, pp. 18-19.[3]

26       24.    Plaintiff was then escorted to 3A05 however it was somewhat slow due to the leg

27  irons being on Plaintiff [sic] feet and/or ankles and was placed in B Section lower B shower for

28
_____
        [3] Defendants also contend that the statements Plaintiff attributes to Seifert are inadmissible hearsay.  Defendants
    are correct.

10

1   approximately 3 – 5 min. Plaintiff was then escorted to the C.I.D. clinic where Plaintiff was placed

2   in the first cage upon entry due not the C.I.D. clinic was not cleared out such as the program office

3   was.

4          Defendants do not dispute that Plaintiff was escorted to the building 3A05 and placed in the

5   shower for decontamination and that he was subsequently escorted to the C.I.D. Clinic.  Defendants

6   dispute all other facts.

7          25.     Captain Seifert and Lieutenant Brodie were waiting in there. Captain Seifert stated:

8   "As I was say, [sic] I saw what happen [sic]. Why do you think I.A. (Internal Affair[sic]) is on the

9   way." As Seifert made that statement about 6 – 7 officers came into the CID clinic.  Following them

10  was the Captain of I.A.  Captain Seifert then informed Plaintiff that was the captain of I.A.  Seifert

11  and the I.A. captain walked to the back and returned shortly. The I.A. captain looked at Plaintiff and

12  walked out."

13         Defendants do not dispute that the Office of Internal Affairs was called to investigate

14  Plaintiff's allegations of excessive force.  Defendants dispute all other facts. Once Plaintiff was

15  placed in the holding cell in the C.I.D. Clinic, no evidence shows that anyone other than Lieutenant

16  Brodie spoke with or remained with Plaintiff until representatives of the Office of Internal Affairs

17  arrived.  Brodie Crime/Incident Report, attached to Esquivel Decl. Ex. B, pp. 14-15.[4]

18         26.     Captain Seifert then stated: "OK, I.S.U. is going to take some pictures of you so go

19  head [sic] in let them so we could get you some medical attention cause [sic] you need it 'BAD'."

20         Defendants do not dispute that the Investigative Services Unit (ISU) took photographs of

21  Plaintiff.  Defendants dispute all other facts.  Again, the statements Plaintiff attributes to Seifert are

22  inadmissible hearsay. Fed. R. Evid. 801.

23         27.     I.S.U. searched Plaintiff kind of freakish, rubbing on Plaintiff buttock and genitals in

24  a sexual matter. Plaintiff complained to Captain Seifert, I.S.U. then stopped their illegal actions, took

25  their pictures, then escorted Plaintiff to A.C.H. (acute care hospital); where plaintiff was sent out to

26  Mercy Hospital from August 4, 2009 to August 7, 2009.

27         Defendants do not dispute that ISU searched Plaintiff, took pictures of him, and took him to

28

_____
[4] Defendants again contend that the statements Plaintiff attributes to Seifert are inadmissible hearsay.
Defendants are correct.

1   Mercy Hospital where he remained for a couple of day.  Defendants dispute all other facts,

2   contending that when Officers Castro and Scaife attempted to search Plaintiff before escorting him

3   out of the C.I.D. Clinic, Plaintiff was agitated and angry. He yelled at and used profanities towards

4   the officers when they attempted to perform a clothed-body search with metal detectors.  The

5   officers did not search Plaintiff in a sexual manner, nor did they improperly search him.  Castro

6   Crime/Incident Report, attached to Esquivel Decl. Ex. B, p. 40; Scaife Crime/Incident Report,

7   attached to Esquivel Decl. Ex. B, p. 62.

8          C.      Analysis

9          "What is necessary to show sufficient harm for purposes of the Cruel and Unusual

10  Punishments Clause [of the Eighth Amendment] depends upon the claim at issue . . . ." *Hudson v.*

11  *McMillian*, 503 U.S. 1, 8 (1992). "The objective component of an Eighth Amendment claim is . . .

12  contextual and responsive to contemporary standards of decency." *Id.* (internal quotation marks and

13  citations omitted).  The malicious and sadistic use of force to cause harm always violates

14  contemporary standards of decency, regardless of whether or not significant injury is evident.  *Id.* at

15  9; *see also Oliver v. Keller*, 289 F.3d 623, 628 (9th Cir. 2002) (Eighth Amendment excessive force

16  standard examines *de minimis* uses of force, not *de minimis* injuries)).  However, not "every

17  malevolent touch by a prison guard gives rise to a federal cause of action."  *Hudson*, 503 U.S. at 9.

18  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from

19  constitutional recognition de minimis uses of physical force, provided that the use of force is not of a

20  sort repugnant to the conscience of mankind."  *Id.* at 9-10 (internal quotations marks and citations

21  omitted).

22         "[W]henever prison officials stand accused of using excessive physical force in violation of

23  the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was

24  applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to

25  cause harm."  *Id.* at 7.  "In determining whether the use of force was wanton and unnecessary, it may

26  also be proper to evaluate the need for application of force, the relationship between that need and

27  the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts

28  made to temper the severity of a forceful response."  *Id.*  (internal quotation marks and citations

12

1   omitted).  "The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does

2   not end it."  *Id.*

3         Construing all disputes of fact in favor of Defendants as the non-moving party, there clearly

4   is a genuine dispute of material fact remaining in this action.  Under Defendants' version of events,

5   force was used only in a good-faith effort to restore discipline, and not done maliciously or

6   sadistically to cause harm.  Plaintiff disagrees with Defendants' version of events.  His

7   disagreement, however, cannot be resolved by a motion for summary judgment.  The Court does not

8   weigh the credibility of the evidence in resolving summary judgment motions.  The Court need not

9   discuss Defendants' additional statement of facts.  Plaintiff is not entitled to judgment as a matter of

10   law, and his motion for summary judgment will be denied.

11   **IV.**    **Conclusion and Order**

12         Based on the foregoing, it is HEREBY ORDERED that Plaintiff's motion for summary

13   judgment, filed February 9, 2012, is denied.

14
   IT IS SO ORDERED.
15

16      Dated:    **September 12, 2012**          /s/ *Dennis L. Beck*

17                                      UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28