# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAMONT SHEPARD,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JAMES E. TILTON, et al.,<br><br>　　　　Defendants. | Case No. 1:10-cv-00023-DLB PC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 37)** |

## I.　Background

Plaintiff Lamont Shepard ("Plaintiff") is a prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR"). Plaintiff is proceeding pro se and in forma pauperis in this civil action pursuant to 42 U.S.C. § 1983. This action is proceeding on Plaintiff's complaint, filed January 6, 2010, against L. A. Martinez, R. Perez, P. Garcia, J. Soto, E. De la Cruz, and A. Trevino for excessive force in violation of the Eighth Amendment. On February 9, 2012, Plaintiff filed a motion for summary judgment. ECF No. 37. On April 9, 2012, Defendants filed their opposition. ECF No. 45. On April 24, 2012, Plaintiff filed his reply. ECF Nos. 48, 52. The matter is submitted pursuant to Local Rule 230(l).

## II.　Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Under summary judgment practice, the moving party

1

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* at 324. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2002); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

2

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting former Rule 56(e) advisory committee's note on 1963 amendments).

In resolving a motion for summary judgment, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

Finally, to demonstrate a genuine dispute, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586-87 (citations omitted).

### III.     Plaintiff's Motion

#### A.     Failure to Comply with Local Rules

Plaintiff lists undisputed facts in his motion for summary judgment without citation. Pl.'s Mem. P. & A. 2-6. Pursuant to Local Rule 260(a),

> Each motion for summary judgment or summary adjudication shall be accompanied by a "Statement of Undisputed Facts" that shall enumerate discretely each of the specific material facts relied upon in support of the motion and cite the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon to establish that fact. The moving party shall be responsible for the filing of all evidentiary documents cited in the moving papers.

An examination of Plaintiff's statement of facts indicates that Plaintiff does not provide the particular citation to the document relied upon to establish the facts. "A party asserting that a fact cannot be genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed

before the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587. For the sake of clarity, the Court will list Plaintiff's statement of facts and Defendants' disputes.

**B.     Plaintiff's Unsupported Statement of Facts and Defendants' Disputes**

1. Plaintiff, a prisoner of the State of California, is serving a life sentence for first degree murder. Defendants do not dispute this fact.

2. On March 15, 2009, Plaintiff informed Director Tilton via Declaration that one of your officers told me (Plaintiff) that the officers here at C.S.P. – Corcoran has it out for me, (Plaintiff) a "red light," and that Plaintiff life was at stake.

Defendants dispute this fact because there is no citation to any evidence, and the fact contains inadmissible hearsay and is irrelevant to the events.[1]

3. On July 28, 2009, Plaintiff was threaten by Defendant Martinez, and informed Plaintiff that, "we go get you N.Word." Plaintiff immediately filed an Inmate Appeal to inform the Warden of Defendant Martinez's intentions to no avail.

Defendants contend that Defendant Martinez never threatened Plaintiff. Martinez Decl. ¶ 44.[2]

4. On August 4, 2009, Defendant Martinez worked overtime on third watch alone with Defendants De la Cruz and Soto to carry out their threat.

Defendants do not dispute that Defendants Martinez, De La Cruz, and Soto worked overtime on August 4, 2009. However, Defendants dispute all other facts, contending that Defendants Martinez, De La Cruz, and Soto did not threaten, assault, or beat Plaintiff on August 4, 2009. Martinez Decl. ¶¶ 3-7, 28-42; De La Cruz Decl. ¶¶ 9-18, 21-24; Soto Decl. ¶¶ 8-21.

5. Specifically, on August 4, 2009, Plaintiff was walking the exercise yard of facility 3A at C.S.P. (Corcoran) at approximately 1530 hours, and noticed an inmate Josey on the east yard. It's the same yard but has a fence down the middle making two yards east yard and west yard. Plaintiff was on the west yard and stopped to talk to inmate Josey, as Plaintiff and Josey are conversing Defendant Perez, rudely stepped in front of I/M Josey, in stated: "you guys cannot talk through the

---

[1] Defendants are correct. Plaintiff's fact is inadmissible hearsay and irrelevant to the events on August 4, 2009.
[2] All declarations are from Defendants' declarations in opposition to Plaintiff's motion for summary judgment. ECF No. 47.

4

fence." Josey and Plaintiff side stepped Defendant Perez and continued to converse with one another, again Defendant Perez stepped in front of I/M Josey. So Plaintiff told Josey, "I will hollar/talk to you when this racist as pig stop tripping."

Defendants do not dispute that a fence divides the yard on Facility 3A into an east and west yard and that Defendant Perez told the inmates, including Plaintiff, to stop talking. Defendants dispute all other facts. Defendant Perez gave Plaintiff a direct order to stop talking and keep moving because he was stopped on the track to have his conversation, which is prohibited by yard regulations. Further, Plaintiff responded to Perez's order with profanity. Perez Decl. ¶¶ 2-6.

6.   Plaintiff proceeded to walk away. So did I/M Josey, however, Plaintiff was called back by Defendant Perez, as Plaintiff turned around Plaintiff notice Defendant Trevino and Garcia was on the west side yard and Defendant Perez coming through the center gate. Defendant Trevino stated: "He's acting hard in front of his homies. We'll get him later when he's by himself."

Defendants do not dispute that Defendant Perez called to Plaintiff. Defendants dispute as to all other facts. Defendant Perez walked over to the west yard where Plaintiff was located, asked Plaintiff for his identification card, and Plaintiff walked within an arm's length of Defendant Perez. Defendants Perez and Trevino ordered Plaintiff to step back away from Plaintiff, but he failed to comply with those orders. Instead, he used more profanity and took a bladed stance and clenched his fists. Perez Decl. ¶¶ 7-11; Trevino Decl. ¶¶ 8-13; Garcia Decl. ¶¶ 3-8.

7.   Plaintiff walked back to Defendant Perez and asked him what the problem was. He stated: "Back up." Plaintiff took a step back. Perez then asked for Plaintiff's [Identification Card]. Plaintiff went to hand Perez his I/D. card. But let it drop to the grass. Defendant Perez stated: "Pick that up." Plaintiff stated: "no, cause if I pick it up, I'm going to put it back in my pocket," Defendant Perez stated: "Well, back up, so I could get it." Plaintiff took another full step back. Defendant Perez picked up the I.D. card and stated: "Do you know you guys can't talk through the yard fence at yard time."

Defendants do not dispute that Defendant Perez ordered Plaintiff to produce his identification card and that Plaintiff walked up to Defendant Perez. Defendants dispute all other facts. Defendants contend that Defendant Perez walked over to the west yard where Plaintiff was located, asked

5

1 Plaintiff for his identification card, and Plaintiff walked within an arm's length of Defendant Perez.
2 Defendants Perez and Trevino ordered Plaintiff to step back away from Plaintiff, but he failed to
3 comply with those orders. Instead, he used more profanity and took a bladed stance and clenched his
4 fists.  Perez Decl. ¶¶ 7-11; Trevino Decl. ¶¶ 8-13; Garcia Decl. ¶¶ 3-8.

5     8.    Plaintiff responded with: "is this rule for black inmates only?"

6 Defendants dispute this fact, contending that Plaintiff addressed Perez and Trevino with
7 profanity and threatening gestures. Perez Decl. ¶¶ 7- 11; Trevino Decl. ¶¶ 8-13; Garcia Decl. ¶¶ 3-8.

8     9.    Defendants Trevino and Garcia took up positions on either side of Defendant Perez.
9 With Defendant Trevino more to Plaintiff's left and Defendant Garcia was to Plaintiff's right with
10 Defendant Perez directly in front of Plaintiff.

11 Defendants dispute this fact.  Defendants contend that Plaintiff walked up to Defendants
12 Perez, Trevino, and Garcia, and used profanities and made threatening gestures.  Perez Decl. ¶¶ 7-
13 11; Trevino Decl. ¶¶ 8-13; Garcia Decl. ¶¶ 3-8.

14     10.    Defendant Trevino then stated: Fuck N. Words. Now do something…Please." Then
15 Defendant Trevino O.C. Pepper Sprayed Plaintiff on the left side of the face. Plaintiff is above irate
16 at this point and turned toward the spray in order to even the score with Defendant Trevino, however
17 the spray hit Plaintiff dead on in the face and Plaintiff dropped to the ground to get under the O.C.
18 Spray and to wipe my eyes to see. Plaintiff notice defendant Trevino standing in front of him and
19 went to go after Defendant Trevino and he (Trevino) ran and someone pushed Plaintiff in the back
20 causing Plaintiff to be off balance and fell on the grass, landing on his back.

21 Defendants do not dispute that Defendant Trevino pepper-sprayed Plaintiff in the facial area.
22 Defendants dispute all other facts. Defendants contend that Defendant Trevino pepper-sprayed
23 Plaintiff after Plaintiff lunged towards Defendants Trevino and Perez. Plaintiff swung his fists and
24 struck Perez on the left side of the head. Trevino and Perez took Plaintiff down to the ground, where
25 he continued to swing his arms, kicked his legs, and resisted their efforts to restrain him.  Perez Decl.
26 ¶¶ 12-16; Trevino Decl. ¶¶ 14-20; Garcia Decl. ¶¶ 8-17.

27     11.    Plaintiff felt someone straddle him, but due to the O.C. spray Plaintiff started to feel
28 the effect on Plaintiff's eyes. Plaintiff was then turned over on to my stomach and handcuffs were

1  applied.

2  Defendants do not dispute that Plaintiff was eventually turned over onto this stomach and
3  handcuffed. Defendants dispute all other facts, contending that no one straddled Plaintiff. Martinez
4  responded to the incident and placed his right knee on Plaintiff's right shoulder to restrain him. Perez
5  Decl. ¶¶ 12-16; Trevino Decl. ¶¶ 14-20; Garcia Decl. ¶¶ 8-17; Martinez Decl. ¶¶ 3-7.

6  12. Plaintiff then heard someone said, "Who is this Shepard." Plaintiff then felt someone
7  jump, knee first into Plaintiff's back. Knocking the wind out of Plaintiff at that same motion
8  someone else jumped on Plaintiff's back and Plaintiff asked them (officers) could they please get off
9  my back cause I could not "breathe," only to be told "Shut the Fuck up, 'cause we about to beat your
10 ass right now." Plaintiff smelled a faint of alcohol coming from the person's (officers) breath that
11 made that statement. Plaintiff smelt the same alcoholic breath coming from defendant Trevino when
12 he stated: "Fuck N. Words no do something…please!"

13 Defendants dispute Plaintiff's fact, contending that no one jumped on Plaintiff's back.
14 Defendant Martinez responded to the incident and placed his right knee on Plaintiff's right shoulder
15 to restrain him. Perez Decl. ¶¶ 12-16; Trevino Decl. ¶¶ 14-20; Garcia Decl. ¶¶ 8- 17; Martinez Decl.
16 ¶¶ 3-7.

17 13. The officers got off of Plaintiff's back due to Plaintiff moving around and kicking due
18 to unable to breathe and reposition themselves on Plaintiff's shoulder blades.

19 Defendants do not dispute that Defendant Martinez placed his right knee on Plaintiff's right-
20 shoulder area and that Plaintiff was kicking.

21 Defendants dispute all other facts, contending that Defendant Martinez placed his right knee
22 on Plaintiff's shoulder to restrain him. Perez Decl. ¶¶ 12-16; Trevino Decl. ¶¶ 14-20; Garcia Decl.
23 ¶¶ 8-17; Martinez Decl. ¶¶ 3-7.

24 14. Plaintiff was in this position for about 3 minutes max.

25 Defendants dispute this, contending that the entire struggle lasted no more than two minutes.
26 There is no evidence how long Plaintiff remained on the ground while staff cleared a safe path off
27 the yard. Perez Decl. ¶ 16; Trevino Decl. ¶ 20; Garcia Decl. ¶ 17; Martinez Decl. ¶ 7.

28 15. Plaintiff was then lifted off the ground and Plaintiff was escorted off the yard during

the escort Plaintiff overheard someone (officer) instruct the escorter of Plaintiff to immediately take him to 3A05 for decontamination. Plaintiff stated overheard 'cause [sic] of the O.C. spray in Plaintiff's eyes."

Defendants do not dispute that Plaintiff was assisted to his feet and escorted off the yard, and that sometime before reaching the Program Office, Defendant Martinez was instructed to take Plaintiff to a location where he could be decontaminated. Defendants dispute all other facts. Captain Seifert, who was on the pathway to the Program Office, stated that Plaintiff needed to be contaminated, but did not specify where. Defendant Martinez noticed that the path to the gymnasium was clear of inmates, but learned that the showers in the gym were not working. Lieutenant Gamboa, who was standing near Seifert, instructed Defendant Martinez to take Shepard to Building 3A05. But the pathway to the housing unit was not clear of inmates. Defendant Martinez informed Gamboa that he needed to place Plaintiff in the Program Office while the path was cleared, and Defendant Martinez received no objection or further instruction from Seifert or Gamboa. Martinez Decl. ¶¶ 20-25.

16. However, due to the breeze (light) of that day, it helped Plaintiff open his eye and notice defendants Soto and Martinez was escorting him. Plaintiff was escorted directly to the "Program Office," and place against the left side wall upon entry for about a minute but as he is standing he is calling out to the lieutenant that defendants just threatened to jump him to no avail.

Defendants do not dispute that Defendants Martinez and Soto escorted Plaintiff to the program office. Defendants dispute all other facts, contending that Plaintiff did not call out to Gamboa or Seifert. He was calling out to other inmates in an attempt to incite them. Martinez Decl. ¶¶ 23-24.

17. Plaintiff was escorted into the cage area of the program office which is directly to your right entry and placed in the cage to the left of the room. Here, defendant Martinez started socking Plaintiff in the back of head [sic] stating: "Ole you go get it now, you fucking Mayete." Due note: while Plaintiff was standing on the wall of the program office Plaintiff heard defendant Martinez state: "Stand here and don't let no one [sic] in. We about to beat this Mayete ass," and close the door of the program office.

8

1   Defendants do not dispute that Plaintiff was escorted to the holding-cell area in the Program Office and that the holding-cell area is immediately to the right upon entering the Program Office. Defendants dispute all other facts, contending that Defendant Martinez did not sock, punch, or hit Plaintiff or use racial slurs against him. When Defendant Soto attempted to place Plaintiff in the holding cell, Plaintiff kicked off the back of the holding cell, forcing his upper body to impact Defendant Soto's upper-chest area, and causing both Plaintiff and Defendant Soto to fall to the ground.  Martinez Decl. ¶¶ 28-32; Soto Decl. ¶¶ 8-12; De La Cruz Decl. ¶¶ 9-14.

18.   Defendants Soto, Perez, Delacruz and Trevino followed suit of defendant Martinez. Plaintiff told defendants to take the handcuff off and we could do this like real man instead of cowardly jumping me with my hands behind my back in leg iron on.

Defendants dispute the fact, contending that none of the Defendants hit, punched, or kicked Plaintiff.  Defendants Perez and Trevino were not even in the holding-cell area of the Program Office; they were in the medical clinic.  Perez Decl. ¶¶ 22-26; Trevino Decl. ¶¶ 23-27; Garcia Decl. ¶¶ 22-25; Martinez Decl. ¶¶ 38-42; De La Cruz Decl. ¶¶ 21-24; Soto Decl. ¶¶ 17-21; Scaife Crime/Incident Report, attached to Esquivel Decl. Ex. B, pp. 60-61.

19.   One of defendants then grabbed a hold of Plaintiff's hair and banged Plaintiff's face against the back of the cage busting Plaintiff's lower lip.

Defendants dispute the fact, for the reasons provided as to Number 18.

20.   Defendants then grabbed Plaintiff shirt and pulled Plaintiff to the ground. Defendant Martinez jumped on top of Plaintiff and started socking Plaintiff about the face about 4 – 6 times either someone pulled him off Plaintiff or he got up on his own, however, defendants Martinez, Perez, Soto, Trevino and Delacruz started kicking and stomping Plaintiff about the face.

Defendants dispute the fact, for the reasons provided as to Number 18.

21.   Plaintiff tried unsuccessfully to roll over to avoid the kicking only to have the handcuffs stomped on rolling back over. Plaintiff notice a small type object hit the floor seeing they were some shades or glasses, looking up only to find defendant Delacruz running at me and kick Plaintiff in the right eye. Plaintiff was knocked unconscious.

Defendants dispute the fact, for the reasons provided as to Number 18.

9

1  22. Plaintiff was awoken by more kick and stomps and words of the racist language.
2  Again, Plaintiff tried to roll over and again the handcuffs was stomped on and again Plaintiff rolled
3  over on his back as oppose to being on his side due to being kicked in the right eye only this time
4  Plaintiff looked up to find defendant Perez standing there looking down and stated: "Fucking N.
5  Word" drew back his foot and kicked Plaintiff in the left eye busting it wide open knocking Plaintiff
6  out a second time.

Defendants dispute the fact, for the reasons provided as to Number 18.

23. Plaintiff is unsure of how long he was unconscious but was awakened by someone yelling at his officers. Unsure of what was being said due to Plaintiff's consciousness after sometime someone pulled Plaintiff to his feet and place Plaintiff against the wall. Previously when Plaintiff first entryed [sic] Plaintiff is going off calling defendant BITCHES, Coward are any name at present time Plaintiff could think of at this point the gloves are off. Plaintiff is very upset from being jumped in said matter. The captain walked over and stated: "Calm down. I need for you to calm down for me. I seen what happen [sic]. Well the ending of it. So I'm go [sic] have my officers here escort you to 3A05 for decontamination. So let my officers escort you and I'll be in the CID clinic when you get there."

Defendants do not dispute that Defendants Martinez and Soto stood Plaintiff up inside the holding-cell area and that Plaintiff leaned up against the wall in the hallway, or that Plaintiff was escorted out of the Program Office to building 3A05 by two officers.

Defendants dispute all other facts, contending that after Defendants Martinez and Soto regained control of Plaintiff inside the holding-cell area, they stood him up and led him to the hallway of the Program Office. Gamboa entered the room and ordered two officers to escort Plaintiff to the housing unit. Gamboa never made any of the comments Plaintiff attributes to him. Martinez Decl. ¶¶ 33-37; Soto Decl. ¶¶ 13-16; Gamboa Crime/Incident Report, attached to Esquivel Decl. Ex. B, pp. 18-19.[3]

24. Plaintiff was then escorted to 3A05 however it was somewhat slow due to the leg irons being on Plaintiff [sic] feet and/or ankles and was placed in B Section lower B shower for

---

[3] Defendants also contend that the statements Plaintiff attributes to Seifert are inadmissible hearsay. Defendants are correct.

10

approximately 3 – 5 min. Plaintiff was then escorted to the C.I.D. clinic where Plaintiff was placed in the first cage upon entry due not the C.I.D. clinic was not cleared out such as the program office was.

Defendants do not dispute that Plaintiff was escorted to the building 3A05 and placed in the shower for decontamination and that he was subsequently escorted to the C.I.D. Clinic. Defendants dispute all other facts.

25. Captain Seifert and Lieutenant Brodie were waiting in there. Captain Seifert stated: "As I was say, [sic] I saw what happen [sic]. Why do you think I.A. (Internal Affair[sic]) is on the way." As Seifert made that statement about 6 – 7 officers came into the CID clinic. Following them was the Captain of I.A. Captain Seifert then informed Plaintiff that was the captain of I.A. Seifert and the I.A. captain walked to the back and returned shortly. The I.A. captain looked at Plaintiff and walked out."

Defendants do not dispute that the Office of Internal Affairs was called to investigate Plaintiff's allegations of excessive force. Defendants dispute all other facts. Once Plaintiff was placed in the holding cell in the C.I.D. Clinic, no evidence shows that anyone other than Lieutenant Brodie spoke with or remained with Plaintiff until representatives of the Office of Internal Affairs arrived. Brodie Crime/Incident Report, attached to Esquivel Decl. Ex. B, pp. 14-15.[4]

26. Captain Seifert then stated: "OK, I.S.U. is going to take some pictures of you so go head [sic] in let them so we could get you some medical attention cause [sic] you need it 'BAD'."

Defendants do not dispute that the Investigative Services Unit (ISU) took photographs of Plaintiff. Defendants dispute all other facts. Again, the statements Plaintiff attributes to Seifert are inadmissible hearsay. Fed. R. Evid. 801.

27. I.S.U. searched Plaintiff kind of freakish, rubbing on Plaintiff buttock and genitals in a sexual matter. Plaintiff complained to Captain Seifert, I.S.U. then stopped their illegal actions, took their pictures, then escorted Plaintiff to A.C.H. (acute care hospital); where plaintiff was sent out to Mercy Hospital from August 4, 2009 to August 7, 2009.

Defendants do not dispute that ISU searched Plaintiff, took pictures of him, and took him to

---

[4] Defendants again contend that the statements Plaintiff attributes to Seifert are inadmissible hearsay. Defendants are correct.

11

1   Mercy Hospital where he remained for a couple of day.  Defendants dispute all other facts,
2   contending that when Officers Castro and Scaife attempted to search Plaintiff before escorting him
3   out of the C.I.D. Clinic, Plaintiff was agitated and angry. He yelled at and used profanities towards
4   the officers when they attempted to perform a clothed-body search with metal detectors.  The
5   officers did not search Plaintiff in a sexual manner, nor did they improperly search him.  Castro
6   Crime/Incident Report, attached to Esquivel Decl. Ex. B, p. 40; Scaife Crime/Incident Report,
7   attached to Esquivel Decl. Ex. B, p. 62.

### C. Analysis

"What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause [of the Eighth Amendment] depends upon the claim at issue . . . ." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). "The objective component of an Eighth Amendment claim is . . . contextual and responsive to contemporary standards of decency." *Id.* (internal quotation marks and citations omitted).  The malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether or not significant injury is evident. *Id.* at 9; *see also Oliver v. Keller*, 289 F.3d 623, 628 (9th Cir. 2002) (Eighth Amendment excessive force standard examines *de minimis* uses of force, not *de minimis* injuries)).  However, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9-10 (internal quotations marks and citations omitted).

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7.  "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Id.*  (internal quotation marks and citations

omitted).  "The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it." *Id.*

Construing all disputes of fact in favor of Defendants as the non-moving party, there clearly is a genuine dispute of material fact remaining in this action.  Under Defendants' version of events, force was used only in a good-faith effort to restore discipline, and not done maliciously or sadistically to cause harm.  Plaintiff disagrees with Defendants' version of events.  His disagreement, however, cannot be resolved by a motion for summary judgment.  The Court does not weigh the credibility of the evidence in resolving summary judgment motions.  The Court need not discuss Defendants' additional statement of facts.  Plaintiff is not entitled to judgment as a matter of law, and his motion for summary judgment will be denied.

### IV.    Conclusion and Order

Based on the foregoing, it is HEREBY ORDERED that Plaintiff's motion for summary judgment, filed February 9, 2012, is denied.

IT IS SO ORDERED.

Dated:    **September 12, 2012**                    /s/ *Dennis L. Beck*
                                                              UNITED STATES MAGISTRATE JUDGE